We are here on a de novo review of the Grant of Summary Judgment on three failure-to-hire claims. More particularly, we are here to review whether or not the plaintiff provided sufficient evidence to raise genuine issue of material facts as to the pretext related to the agency's reasons for taking action against Mr. Chapple. We are not here to talk about the Primate Fish case for several reasons, but most particularly this Court's Starnes v. Wallace case in 2017 following the United States Postal Board v. Aikens in 1983 from the Supreme Court, finding that when a defendant presents a legitimate nondiscriminatory reason for taking action against a plaintiff, the focus becomes whether or not there's evidence of pretext, and the prima facie analysis falls away. Related to that, the first position is the 2014 Director of Licensing and Credentialing case, the DLC position, that Mr. Chapple had performed for eight years exceptionally well without contradiction. The context of the pretextual evidence in this case is substantial. We have an agency where 1,500 employees over a five-year period, an average of 300 a year, are coming back, retirees are coming back and taking their former jobs or other jobs that they qualify for. Mr. Chapple also testifies that it was common knowledge and common observation to see this happening over that period of time. Ms. Henderson, the decisionmaker, is mentoring Ms. Borland, the successful applicant for that position, in a program where Ms. Henderson learns of Ms. Borland's educational background and her work experience. Ms. Henderson, in that program, only mentored women, even though there was mentoring for men and women in that program. And also, Ms. Henderson admits that she learned, well, after that point, the position comes open, the DLC position comes open. Ms. Henderson recommends to Ms. Borland to apply for the position. Ms. Henderson then goes about changing the criteria of the position and she does so in violation of the agency's policies as well as the state auditor's policies by making a bachelor's degree required on certain areas of field of study where the policy says that that should be a preference. She makes a preference for an advanced degree, all in favor of Ms. Borland because she knows her background. She then takes away the experience equivalent, which is part of the state auditor's recommendation for this particular position. Of course, that would protect against any returning retiree, to include Mr. Chappell or anyone that would have that kind of experience. Are you saying that in itself is age discrimination? No, Your Honor. I am not. I'm talking, that is, in fact, I think age isn't a factor here. It's the gender and race that are at issue. So what does that have to do with gender and race is my question. Your Honor, it's about Ms. Henderson promoting Ms. Borland, acting in support of the white female. She also hired, the second time she hired for that position in 2016, the third position, she hired a white female again. And if you look at the evidence, Ms. Borland, in fact, is not the most qualified candidate, not just as to Mr. Chappell, but if you look at HHSC's, the agency's own chart of the applicants, which is Record Exit 14, you'll see that there's at least five people that have better qualifications than Ms. Borland for this position. But she is trying to promote the young female. And that's where that mentoring comes in, where she's only mentoring females. In her deposition, Ms. Henderson tried to deny that she mentored only females, but in fact later admitted it on further examination. When it comes to deciding who to interview, then the pretext gets even stronger. Because Ms. Henderson tells the EEOC there's two reasons why she didn't interview Mr. Chappell. One is he wasn't a current employee, which has nothing to do with the job, either the posting or doing the job, and that he has a lack of an attention to detail. Well, that's interesting because the evidence that she says that resulted in that finding is Mr. Chappell had one digit of one year typoed, 2012 instead of 2013. But you have Mr. Schmidt, who was interviewed, who had multiple typos in his job application, as well as the fact that Mr. Schmidt didn't even meet the required bachelor's degree in a particular field of study that Ms. Henderson had placed on it. Which then, and if you also look at the fact that he doesn't have the years of experience, so she picks a male to go up against Ms. Borland, her preferred candidate, that is patently not qualified for the position and is in direct contradiction as to why she didn't interview Mr. Chappell for the position. She also testified that Mr. Chappell was the third most qualified candidate at that time. Then we get to the actual interview and the selection of Ms. Borland. If you compare the record excerpts 14 to 15, 15 is the written justification for hiring Ms. Borland, saying how wonderful she was in the interview and how she established herself. But if you compare the record excerpts 14, you'll see that on her qualifications, there are four items where there's no assessment by HHSC that she met those four. But word for word, you find that language in record excerpts 15, the justification for hiring. So why are there these contradictions time and time again? These are fact issues. These are genuine issues of material fact that a jury needs to decide, not a judge. We then also, their corporate representative, Ms. Tippie, in record excerpts number 10, her deposition excerpts, she says that the interview questions that were asked had nothing to do with the DLC position specifically. They were just general management questions. So we really have no evidence that Ms. Borland was qualified for that position or had any particular qualification for the DLC position. Moving on to the second position, the A. Digper, the assistant director, inspector general, et cetera, et cetera, external relations position. This position is a retaliation claim, and Mr. Bowen, the inspector general, is the decision maker in this role. There are several reasons why we present that Mr. Bowen knew of Mr. Chappell's protected activity. And it's not just general information, as the Court had found, general knowledge. It's specific information, and specific circumstantial evidence, when taken together, would raise a genuine issue of material fact as to whether Mr. Bowen knew about Mr. Chappell's protected activity, which include Mr. Chappell complaining to Commissioner Traylor and Commissioner Weizenbaum about his discriminatory experience from 2014 in August of 2015. And then in October of 2015, Mr. Chappell meeting Mr. Bowen in an interview and recommending that Mr. Bowen talk to the two commissioners about their knowledge of how, what a good employee Mr. Chappell had been for the eight years that he was there. And Mr. Bowen telling Mr. Chappell, I think you should be, you would be good for this other position. So, but Mr. Chappell never hears back from Mr. Bowen. Mr. Bowen hires Ms. Komkoff at the beginning of November 2015, and directs her to quickly fill the egg dig position. She does so. Within three weeks of her hire, she sets up interviews. The day before the interviews happen, she identifies Mr. Chappell as the fourth interviewee. And that would be found in her deposition, I mean, her emails of Record Excerpt 17. And she, I, she tells Mr. Bowen that we, I'm adding Mr. Chappell. And she does the interviews. She identifies Mr. Chappell as the top candidate. Mr. Bowen then, well, before we get there, Record Excerpt 18 shows that on November 20th of 2015, there's a received stamp from HHSC receiving Mr. Chappell's formal charge of discrimination. So, five days later is when the interviews happen. Five days later is when Ms. Komkoff tells Mr. Bowen that Mr. Chappell is going to be interviewed. Then the next week, he's the top candidate. Then Mr. Bowen tells her not to fill the position. Back in 2015, and when his deposition was taken, Mr. Bowen could not explain why the decision was made not to fill the position. Back in 2015, and when I took Ms. Komkoff's deposition, she couldn't say why that action was taken. The Boski v. Starr County case from this Court holds that if a defendant does not explain specific decisions, that is evidence of pretext. So it doesn't stop there. Mr. Bowen and Mr. Arnold, his assistant, create a quote-unquote new position. But it's not a new position. If you compare Record Excerpts 19 to Record Excerpts 20, the A. Digpur position versus the D.E.R. position, the Director of External Relations, we have the same Director III position for both. We have the only differences between the, if you look at the essential functions and the knowledge, skills, and abilities, they're the same because they just shift the phraseology. They just kind of move one phrase from one sentence to another, and it's, and it was there as an admission from Ms. Hall, Ms. Tippie, that it was in fact the same, or very similar in the two positions. And they fill this position, again, why, when he says not to fill the position, why doesn't he fill it when he, when Mr. Chappell was a successful applicant? And Ms. Comcoff tells Mr. Chappell, I'm going to keep your application for the future. And Mr. Chappell never hears back about that. The last position is the 2016 D.L.C. position. In this case, Ms. Henderson absolutely knows about the protected activity because she's preparing responses to the EEOC related to Mr. Chappell's complaints. Ms., again, the D.L.C. position has not changed from when Mr. Chappell had done it. There's no evidence that it changed at all, all the way through even to today. But Mr., Ms. Henderson uses the same job description, and this is, can be found in Record Episodes 11 and 12, the 2014 and the 2016. The only difference is Ms. Henderson fixes typos, but it goes from 21 typos down to 11 typos. And I don't care about the typos, but they're the ones that brought up the typos of Mr. Chappell's application as being an issue, and he only had one. But she hires, there's several issues here. She still interviews Mr. Schmidt, even though he doesn't meet the required bachelor's degree component, and he's still in the top three. But somehow Mr. Chappell now goes from being in the top three candidate down to not even in the top ten, but doesn't explain why. And so, and then we have her interviewing three people instead of just two this time. The third person now, so there's a white male, a white female, and now a black female. It's kind of a Benetton approach to defending against a discrimination complaint. Of course, this isn't a discrimination complaint at this time. This is a retaliation complaint. And so, but what's interesting is Ms. Dr. Allred, she has a Ph.D. So again, there's no, there's been no evidence presented by Henderson that the increased degree would result in a better performance of the DLC position. The DLC position has nothing to do with healthcare distribution. It has nothing to do with managing whether and how they provide healthcare. It's only about managing the processes about qualifications for receiving licensure and entities. And that's what Mr. Chappell had done very well. Ms. Henderson's communications about Ms. Dr. Allred and her performance in her deposition again had nothing to do with the performance of the DLC position. It was just general management comments about her having great ideas and having done some research about the topic. But Dr. Allred's degrees were not in the specific areas that were identified by Ms. Henderson as the fields of study that she would prefer for this candidate. And therefore, you know, she could have been, you know, a Ph.D. in ancient Greek. It didn't matter because it had nothing to do with the performance of the job. She just was trying to, again, hire somebody. I'm out of time and I'll reserve the rest for my remarks. Yes, you've saved time for rebuttal. Thank you so much. Thank you. Ms. Bautista. May it please the Court. Texas Health and Human Services interviewed and hired the most qualified candidates for this position of the 2014 and 2016 Director of Licensing and Credentialing position. Specifically, Ms. Henderson, the hiring manager for that position, found that Cindy Borland had relevant experience in licensing. She met the educational requirements and the educational preference that was specifically set out in the screening criteria, and she was considered the top applicant. With regard to Dr. Allred, she was also deemed to be the most qualified. She had the advanced degree requirements. She had dispute resolution experience, which Ms. Henderson thought would be very relevant to a transformation of the agency that caused Texas Health and Human Services and the Department of State Health Services to merge. What do you say to his argument about the change in criteria to do away with the advanced degree? Ms. Henderson determined that it was her preference that that be an advanced degree and that the bachelor's degree be in a relevant field. She removed the experience requirement. It was not to exclude retirees, and in fact, being a retiree is not a protected class. The types of changes that she made were business decisions, and the Fifth Circuit has specifically held multiple times that the courts do not stand in the place of managers and in their personnel decisions. Just looking at the overall picture, there were two levels above that position that neither of which required a bachelor's degree, right? I'm not sure that that was raised in the plaintiff's brief and in the appellant's brief, and I am not sure that that is evidence. There were two positions that were higher up the chain than this one, and neither of those required a bachelor's degree. I would just argue that Ms. Henderson was not in charge of setting the criteria for those positions. In her testimony and in the testimony of her manager, the former executive commissioner of the Department of Aging and Disability Services, it was laid out that it was her discretion to determine the requirements for this position, and she felt that this is what was needed for the job, given not only a departmental transformation in 2014 that involved some complexities, but also related to the agency transformation and merging in 2016. So the licensing position requires not only performing the licensing functions for nursing homes, assisted living centers, adult daycare centers, home health agencies, which are definitely in the business of providing health care services. It also involved credentialing nurses. It involved data management functions that reported to the legislature, federal reporting, and responding to open records of the division. That is from Mr. Chappell's testimony. I thought Mr. Chappell had done all of that for several years before that. Mr. Chappell, undoubtedly, it's not a dispute that he performed those job functions as the Ms. Henderson was new to the agency. She determined what she thought were the requirements of that position. Ms. Henderson didn't know Mr. Chappell. She wasn't making this decision in the context of knowing that she was trying to exclude someone for not meeting the degree requirements. She had the discretion to set these requirements, and she did so. Specifically, with regard to these requirements, the degree in a related field and an advanced degree, objectively, Mr. Chappell did not meet the requirements. His bachelor's was in journalism. He did not have an advanced degree. The experience equivalent was removed, so he also didn't have... Why was it removed? Pardon? Why was it removed? Because the advanced degree requirement was added, and it was not Ms. Henderson's preference that experience be substituted for education. The argument is that she tailored her preferences to pick one white woman. I'm sorry? The argument is that she tailored her so-called preferences so that it would fit one white woman. It's an argument without evidence to support it. There's no evidence or testimony that supports that speculation, and speculation alone is not enough to raise a material fact issue. What other candidates met those requirements? Mr. Schmidt met those requirements, and he's a white male. Ms. Fleming, who is a black female, met those requirements in 2016. Again, Mr. Schmidt met those requirements in 2016. And then the candidate who Ms. Henderson interviewed in 2016 and ultimately hired, Dr. Allred, also met those requirements. And so, basically, Ms. Henderson chose to interview and then ultimately hire candidates only that met the screening requirement and the advanced degree requirement. She testified that she thought Mr. Schmidt's... Actually, undoubtedly, Mr. Schmidt's undergrad is in health education, which on its face relates to the healthcare administration, and certainly as determined by Ms. Henderson. Dr. Allred had an undergraduate in psychology, a master's in experimental psychology, and a Ph.D. in experiential psychology, and Ms. Henderson testified that she thought the administration of psychological practice was related to healthcare administration and was relevant to the position of the director in licensing credentialing because of the functions that that job entailed. And I think, so, appellant raises issues about testimony regarding the interview questions  But there's really no evidence that Ms. Henderson screened for a particular candidate, but if she did in contravention of HHSC policy, that also is insufficient to raise a material fact issue under Fifth Circuit law. We certainly don't subscribe to that interpretation, and it's speculative at best. There are also key mischaracterizations of the evidence, especially with regard to the Mr. Arnold, I mean, there was no reason for the job in the Inspector General Department to be repurposed, but actually the testimony, as well as documents, indicate that Ms. Komkoff communicated to Mr. Chappell that it was being changed for organizational reasons, and Mr. Arnold, who was also in that division, testified that the reason the position was to be repurposed is because only the external relations functions of the position would remain and the policy and strategic planning would be removed. So, and the job requirement, the job requisitions support that. So, here with HHSC's interpretation of the documents, there is actually evidence to support it. And indeed, Mr. Arnold's knowledge regarding a possible complaint by Mr. Chappell or the essentially, appellant relies on the fact that Mr. Bowen was given a referral by Mr. Chappell during an interview, and that without providing any evidence that he then spoke with Mr. Traylor, the executive commissioner of HHSC, about Mr. Chappell, there's nothing to support that. It's purely speculation. And in fact, the next leap that you have to make is that they specifically spoke about Mr. Chappell's complaint. Appellant's other theory regarding knowledge is also unsupported. So, appellant argues that Mr. Chappell's complaint was discussed in executive team meetings, and Mr. Bowen somehow heard that. Mr. Bowen testified and provided a sworn statement stating overtly he did not know about Mr. Chappell's complaint or his charge. And in fact, when speaking about the executive team meetings, Mr. Bowen specifically said that he rarely attended those meetings, and when he did, he never heard anything about these complaints. And in fact, what was discussed in his experience was major litigation, press-worthy lawsuits. And he testified as to, you know, this major litigation involving post-consent decrees and court monitoring. So, it was very large litigation. The testimony that appellant refers to merely states that it is possible that a complaint could be discussed in these executive team meetings. That is just not enough. It is speculative, and you've got testimony that specifically refutes that theory. Mr. Chappell also asks that you take a leap regarding his reports of discrimination to Mr. Traylor and Mr. Weizenbaum. Mr. Chappell, in his own deposition testimony, and that is in the record at page 640 through 642, talks about his very vague conversation with Mr. Weizenbaum and Mr. Traylor. And essentially, he's asking, he testified that he thought that they intuitively knew what he was talking about. Why did they think this? Mr. Weizenbaum, because he did not respond to what Mr. Chappell was saying, that's how Mr. Chappell assumed that he knew. And then with regard to Mr. Traylor, Mr. Chappell assumed that he knew because they had that kind of relationship. He knew. He knew what? That he knew that Mr. Chappell was complaining of discrimination. And in fact, what he testifies to doing is merely, I believe, collecting documents and the like. And in fact, Mr. Traylor and Mr. Chappell were talking about a potential job opportunity that Mr. Traylor was trying to provide through John Weizenbaum. So the conversation that Mr. Chappell has with Mr. Traylor is regarding a potential job opportunity. And his conversation with Mr. Weizenbaum also involved whether Mr. Weizenbaum had a potential job opportunity that he knew of to help Mr. Chappell. So both of these commissioners were actively trying to assist Mr. Chappell. And indeed, appellant acknowledges that in the interview with Mr. Bowen, Mr. Bowen was also encouraging him to apply to other positions. So it's difficult to imagine that these same executives would not only be speaking to each other about a single individual complaint, especially when there's testimony to the contrary, and the fact that they were in positions to help him and were actively trying to do that. Mr. Chappell also fails to establish but for causation on the DLC 2014 and 2016 position. Essentially, he has to prove that he's clearly more qualified than the candidate who was chosen or the interviewees. And actually, he's unable to do that because he doesn't meet, it's not in dispute that he doesn't meet the screening criteria. But the but for causation is not part of the prima facie case, is it? It is not. It's regarding the establishing pretext. But the district court appeared to apply it at the prima facie stage. The causation element at the prima facie case is less burdensome, I believe. And so it would be appropriate to apply it there as well. But, you know, it's our contention and it was our contention at the district court that even under the prima facie case, Mr. Chappell was not objectively qualified for the position. But certainly at the pretext stage, he has not established, he's not met his burden as to that element. Mr. Chappell relies repeatedly on his tenure. And there's case law that HHSC cited regarding the fact that tenure does not make him clearly better qualified. He cannot raise a fact issue as to that with just that repeated assertion. So he really fails to get there. There's just no there's no evidence to support this position. Mr. Chappell asks this court to really take a magnanimous view of the record and really subscribe to a lot of his speculation and theories. And that alone cannot get you there. There has to be substantive evidence. The fact that Ms. Henderson mentored Cindy Borland in no way indicates that she then screened the or screened her or changed the screening to specifically hire her. And nor do those qualifications tie to race or gender. And it is evident that the screening did not apply in a discriminatory way because a male, a white male was considered for both positions in 2014 and 2016. And in 2016, an African-American female was considered as well along with two females. And as stated before, they all met the criteria that Ms. Henderson thought was important for the position. I think it's notable as well that Ms. Henderson and Ms. Allred performed very well in their interviews. Again, that's a criteria that was left to the hiring manager. And jumping back to the inspector general position, I just want to note that Ms. Konkov was the hiring manager for that position. The appellant does not refute the fact that she had no knowledge. She testified that she had no knowledge, a sworn statement that she had no knowledge of Mr. Chappell's complaint or his charge. And both Ms. Konkov and Mr. Bowen testified and provided sworn statements to that effect, as well as the fact that they did not communicate about Mr. Chappell with Mr. Traylor or Mr. Weizenbaum. So even if you subscribe to this theory that Mr. Chappell did complain to these executive commissioners, you have testimony, and it's not refuted. So Mr. Chappell just does not meet his burden here. All right. Thank you, Ms. Bautista. Thank you. Watson for rebuttal. Yes, Your Honor. Ms. Henderson and the agency provided no explanation for the removal of the experience equivalent. There is no job-specific reason to remove that experience equivalent other than to promote Ms. Borland and to remove competition from returning retirees. There's no explanation for other than I think it would be good to have an advanced degree. There was no job-related explanation to tie the advanced degree in. But how does that show race or gender discrimination? Because it was made in favor of Ms. Borland and in line with the evidence of Ms. Henderson only mentoring females and then in her deposition trying to say, seeing she's an attorney herself, seeing that it looks like she has a preference for females, trying to say she had males and couldn't name a one, and then eventually admitted that she had only mentored females. And Mr. Chappell, now, then you get to the point where she finds out— Do you dispute that there were males that fit the criteria? Oh, no, Your Honor. Well, I say Mr. Schmidt didn't fit the criteria. If you look at Record Excerpt 14, there's a question mark for him there. Health education, that's PE. Were there males who fit the criteria? Yes, and in Exhibit 14 you'll see there's a Curtis Walters and a James Yocum, but they've got more yeses on their names than even Ms. Borland does. They didn't get selected for an interview. Mr. Chappell had—there's a question mark on one of the items and then two other items left blank when Mr. Chappell had done the job for eight years exceptionally well. There is no documentation or assertion from the agency that Mr. Chappell never met the requirements in excess of the expectations. But they don't even want to admit it in their own document reviewing the applicants. Again, no explanation for these things. We're looking here at a judgment by a district judge who's very careful and even-handed. I'm sure you agree with that. Of course, it's your job to appeal the judgment. I understand that on behalf of your client. If we were to look back at what Judge Sparks did here and the orders that he issued, where might we go to find out specifically where he made a wrong turn? I understand that you make several different criticisms of what was done, but where might we look to see where he may have misunderstood something that we can focus on? Yes, Your Honor. I think he gets the standard wrong. He tries to say that I have to show and have to establish pretext instead of raise genuine issue of material facts. Counsel says that I'm asking the court to take leaps. I'm asking the court to make reasonable inferences as per the standard. The court also doesn't actually analyze the case and the claims of Mr. Chappell. The agency has never provided a legitimate nondiscriminatory reason for making the changes to the criteria for the job. And the court simply takes their representations of what they did and did they apply it correctly, assuming that Ms. Henderson has the ability to make these changes, and she did, and therefore she applied them. She made these changes before Chappell applied, right? Correct. But she made these changes in violation of the policies. She doesn't have absolute authority to make these changes. She's supposed to get them approved by HR, supposed to get them approved by her supervisor. She didn't. And they violate the policies of being – there's a specific policy that says in Record Action 5, and it says you cannot make the criteria so restrictive that someone that could reasonably be able to do the job would be screened out. That's Mr. Chappell all over. And nothing was done to stop that from happening. Ms. Henderson was allowed to run roughshod over – That doesn't have to do with the forbidden categories of discrimination, does it? Well, Your Honor, and to the extent that the applicants coming forward would not be the white female that Ms. Henderson wanted. So it was one of these situations just in talking about the criteria alone, which we don't have to rely on because we have the decisions not to interview – the contradictory decisions not to interview Mr. Chappell and interview Mr. Schmidt and also not interview the other five returning retirees that would have qualified for the job that were more qualified than Ms. Borland, men and women. All right. Thank you, Mr. Thompson. Your case is under submission. Thank you, sir. Last case for today, PHI, Incorporated v. Epical Industries, Incorporated.